# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 8, 2011        Decided January 6, 2012

No. 11-1018

REPUBLIC AIRLINE INC.,
PETITIONER

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,
RESPONDENT

———

On Petition for Review of an Order
of the Department of Transportation

———

*Christopher T. Handman* argued the cause for the petitioner. *Robert E. Cohn*, *Patrick R. Rizzi* and *Dominic F. Perella* were on brief.

*Timothy H. Goodman*, Senior Trial Attorney, United States Department of Transportation, argued the cause for the respondent. *Robert B. Nicholson* and *Finnuala K. Tessier*, Attorneys, United States Department of Justice, *Paul M. Geier*, Assistant General Counsel for Litigation, and *Peter J. Plocki*, Deputy Assistant General Counsel for Litigation, were on brief. *Joy Park*, Trial Attorney, United States Department of Transportation, entered an appearance.

Before: HENDERSON, *Circuit Judge*, and WILLIAMS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Republic Airline Inc. (Republic) challenges an order of the Department of Transportation (DOT) withdrawing two Republic "slot exemptions" at Ronald Reagan Washington National Airport (Reagan National) and reallocating those exemptions to Sun Country Airlines (Sun Country). In both an informal letter to Republic dated November 25, 2009 and its final order, DOT held that Republic's parent company, Republic Airways Holdings, Inc. (Republic Holdings), engaged in an impermissible slot-exemption transfer with Midwest Airlines, Inc. (Midwest). In so holding, DOT summarily dismissed Republic's argument that, under both DOT and Federal Aviation Administration (FAA) precedent, the Republic-Midwest slot-exemption transfer was permissible because it was ancillary to Republic Holdings' acquisition of Midwest. Because DOT has departed from its precedent without adequate explanation, its decision cannot survive arbitrary and capricious review. Accordingly, we grant Republic's petition for review and vacate DOT's order.

## I. BACKGROUND

In an effort to improve airport safety and efficiency, FAA limits the number of take-offs and landings at several of the nation's most congested and frequently delayed airports. *See, e.g.*, *Operating Limitations at N.Y. LaGuardia Airport*, 71 Fed. Reg. 77,854 (Dec. 27, 2006). Historically, FAA distributed a limited number of "slots"—i.e., take-off and landing rights—at five so-called high-density airports, including Reagan National. *See* 14 C.F.R. § 93.123. The

resulting slot-allocation rules are collectively known as the High Density Rule (HDR). *City of New York v. Minetta*, 262 F.3d 169, 172 (2d Cir. 2001) (citing 14 C.F.R. §§ 93.121-93.133, 93.211-93.229)*.*

"By the early 1990s, however, the HDR was perceived as a barrier to improved service, in part because new air carriers were unable to establish service due to the lack of slot availability." *Id.* at 172-73 (citing H.R. Rep. No. 106-167, pt. 1, at 77-79 (1999)). As a result, in 1994, the Congress amended the statutory scheme to enable DOT to grant a limited number of exemptions to the slot limits. *See* Pub. L. No. 103-305, § 206, 108 Stat. 1569, 1584 (1994) (codified, as amended, at 49 U.S.C. § 41714(c) (2000)). These aptly-named "slot exemptions" permit take-offs and landings in addition to those available under the HDR. *See id.*[1]

Today, the HDR has been phased out at four of the five high-density airports.[2] Only Reagan National continues to operate under it. At Reagan National, DOT has 20 slot exemptions which can be issued to any carrier providing non-stop service to an airport within a 1,250 mile radius. *See* 49

---

[1]     In practice, a slot exemption authorizes an airline to provide nonstop service to or from a slot-controlled airport during a particular time frame—for example, from Reagan National to Kansas City, Missouri, daily at the 1 p.m. time period.

[2]     The FAA lifted the HDR at Newark Liberty International Airport in the early 1970s. *See High Density Airports; Notice of Reagan National Airport Lottery Allocation Procedures*, 69 Fed. Reg. 67,382 (Nov. 17, 2004) (discussing elimination of HDR at Newark). In 2000, the Congress eliminated the HDR at Chicago O'Hare International Airport (effective July 1, 2002) and LaGuardia Airport and John F. Kennedy International Airport (effective January 1, 2007). *See* Pub. L. No. 106-181, § 231, 114 Stat. 61, 108 (2000) (codified at 49 U.S.C. § 41715(a)).

U.S.C. §§ 41718(b), 49109. The DOT distributes the exemptions

> in a manner that promotes air transportation—
>
>> (1) by new entrant air carriers and limited incumbent air carriers;
>>
>> (2) to communities without existing nonstop air transportation to [Reagan National];
>>
>> (3) to small communities;
>>
>> (4) that will provide competitive nonstop air transportation on a monopoly nonstop route to [Reagan National]; or
>>
>> (5) that will produce the maximum competitive benefits, including low fares.

*Id.* § 41718(b). Importantly, "[n]o exemption . . . may be bought, sold, leased, or otherwise transferred by the carrier to which it is granted." *Id.* § 41714(j).

On July 31, 2009, Republic Holdings acquired Midwest in a 100% stock purchase, making Midwest its wholly-owned subsidiary. At the time of the acquisition, Midwest provided three nonstop round-trip flights between Kansas City International Airport (KCI) and Reagan National each day. One of the three flights was made possible by the two slot exemptions at issue here. Two months later, on September 30, 2009, Republic sent a letter to DOT outlining the details of the acquisition and explaining that "as of November 3, 2009, Republic will operate all of Midwest's schedules under the d/b/a trade name Midwest Airlines and become the holder and operator of Midwest's [Reagan National] slot exemptions." Letter from Robert Cohn to Todd Homan, at 1 (Sep. 30, 2009). Republic further noted that, although section 41714(j) prohibits an airline from buying, selling, leasing or otherwise transferring slot exemptions:

> [DOT] precedent in the *America West/US Airways*, *American Airlines/Reno Air*, and *Southwest Airlines/ATA* acquisitions establish[es] that the prohibition against transferring slot exemptions does not apply to ancillary transfers which are the product of a corporate acquisition or merger, such as Republic/Midwest.

*Id.* at 4. Republic assured DOT that, just as in the cited cases, it intended to use the slot exemptions in the same manner for which they had been granted. Although Republic planned to replace Midwest's Boeing 717s with Embraer regional jets, "there [would] be no [other] perceptible change to the services offered." *Id.* at 2. Indeed, Republic even maintained Midwest's brand name. *Id.* ("Republic will continue the Midwest branded service, including services at slot controlled airports . . . under the d/b/a trade name Midwest Airlines.").

On November 25, 2009, DOT sent Republic an informal letter rejecting Republic's proposed action and "conclud[ing] that a 'transfer' of exemptions ha[d] in fact occurred." Letter from Susan Kurland to Robert Cohn, at 1 (Nov. 25, 2009) (November 25th Letter). According to DOT, once acquired, Midwest no longer existed as a carrier; thus, Republic's right to the exemptions resulted from an impermissible slot-exemption transfer. *Id.* at 1-2. DOT informed Republic that it could continue to use the slot exemptions pending a formal reallocation proceeding and could apply, through that proceeding, to keep the slot exemptions. *Id.* at 2 ("[T]he Department will resolicit applications for the two [Reagan National] slot exemptions, and then determine which application best satisfies the criteria imposed in section 41718(b). Republic is of course invited to submit an application for Kansas City (or for any other service it believes will best satisfy the statutory criteria)." (emphasis removed)).

Republic did just that. On September 30, 2010, Republic applied to retain the slot exemptions for KCI/Reagan National round-trip service, arguing *inter alia* that it offered the lowest fares, that continuing the route would maximize competition and that Kansas City's economy would suffer from the loss of a daily direct flight to Reagan National. *See* Application of Republic Airline Inc., Docket No. DOT-OST-2000-7182, at 8-10 (Sep. 30, 2010). Republic also renewed its argument that the slot exemptions were "categorically not subject to reallocation" because "under well-settled precedent, [Republic Holdings'] acquisition of Midwest [] did not constitute a prohibited transfer that would have warranted reallocation." *Id.* at 11 n.9.

On December 10, 2010, DOT issued Order No. 2010-12-16 (Final Order), withdrawing the exemptions and reallocating them to Sun Country for nonstop round-trip service between Lansing, Michigan and Reagan National. Final Order at 1. In two brief footnotes, DOT rejected Republic's argument that its transfer did not violate section 41714(j). According to DOT, it had "carefully considered, and rejected, these arguments in [its] [November] 25, 2009 letter to Republic['s] counsel," *id.* at 11 n.14, and it directed Republic to the earlier letter "for a full discussion as to why [it] found that the proposed transfer would violate section [41714(j)]," *id.* at 2 n.1.

Republic petitions for review pursuant to 49 U.S.C. § 46110(a) and (c) and 5 U.S.C. § 706.

## II. ANALYSIS

The Administrative Procedure Act instructs us to "hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although the scope of review under the arbitrary

and capricious standard is narrow and a court is not empowered to substitute its judgment for that of the agency, *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009), the agency must provide a "rational connection between the facts found and the choice made" so as to afford the reviewing court the opportunity to evaluate the agency's decision-making process. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 158 (1962)). One of the core tenets of reasoned decision-making is that "an agency [when] changing its course . . . is obligated to supply a reasoned analysis for the change." *Id.* at 42; *see also Kreis v. Sec'y of the Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005) ("It is axiomatic that an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." (internal quotation marks omitted)). That said, an agency is not required to distinguish every precedent cited to it by an aggrieved party. *See Bush-Quayle '92 Primary Comm., Inc. v. Fed. Election Comm'n*, 104 F.3d 448, 454 (D.C. Cir. 1997) ("We may permit agency action to stand without elaborate explanation where distinctions between the case under review and the asserted precedent are so plain that no inconsistency appears."). But where, as here, "a party makes a significant showing that analogous cases have been decided differently, the agency must do more than simply ignore that argument." *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004).

As Republic outlined at considerable length in its September 30, 2009 letter, DOT and FAA precedent in the America West/US Airways, American Airlines/Reno Air and Southwest Airlines/ATA acquisitions establish that the prohibition against transferring slot exemptions does not apply to a transfer that is part-and-parcel of a corporate acquisition or merger. DOT first confronted this issue in

1999, after American Airlines, Inc. (American Airlines) announced its plan to "purchase all outstanding stock" of Reno Air, Inc. (Reno Air) so that Reno Air would become the wholly-owned subsidiary of the parent company. *See Appl. of Reno Air, Inc. for Exemption*, Order No. 99-2-26, 1999 WL 95072, at *1 (DOT Feb. 23, 1999) (Order on Motion to Reopen the Record) (*Reno Air*). A competitor filed a protest with DOT, arguing that Reno Air's slot exemptions at O'Hare International Airport should be reallocated because the merger resulted in a prohibited "transfer" of the exemptions. *See id.* at *4. DOT dismissed the challenge. *Id.* According to DOT:

> The proscription of selling, trading and transferring slot exemption authority was intended to prevent the formation of a market for slot exemption authority. Because mergers present a substantially different market than one trading slot exemptions, the Department has the discretion to treat the effect of the merger . . . as not violating the proscription . . . .

*Id.*[3] Accordingly, it allowed the newly-formed American Airlines subsidiary to continue to hold the exemptions originally granted to Reno Air.

---

[3]    Although, as DOT notes, *Reno Air* is "not a [s]ection 41714(j) DOT precedent, as it arose prior to enactment of the statute," Respondent's Br. at 15, we nonetheless find it persuasive. The provision of the 1994 DOT order at issue in *Reno Air* is nearly identical to section 41714(j). *Compare Appl. of Reno Air, Inc.*, Order No. 94-9-30, 1994 WL 521207, at *4 (DOT Sep. 20, 1994) (carrier prohibited from "selling, trading, transferring, or conveying" exemption), *with* 49 U.S.C. § 41714(j) (exemption may not be "bought, sold, leased, or otherwise transferred by the carrier to which it is granted"). DOT has provided no sound reason why it interprets similar language differently. Indeed, DOT itself cited *Reno Air* in *America West*, *infra*, which *is* a section 41714(j) case.

DOT reached the same result seven years later when U.S. Airways, Inc. (U.S. Airways) merged with America West Airlines (America West). *See Pet. of the Air Carrier Ass'n of Am.*, Order No. 2006-3-6, 2006 WL 2658672 (DOT Mar. 7, 2006) (*America West*). After the merger was announced, an industry group petitioned DOT, arguing that America West was attempting to "transfer or convey its slot exemptions to the new US Airways/America West entity" and that, under section 41714(j), the exemptions should be reallocated. *Id.* at *2. Relying on *Reno Air*, DOT once again dismissed the challenge and held that, while an acquisition of corporate assets only (including slot exemptions) might be an impermissible transfer, "the type of merger at issue here"— namely, a complete corporate merger—does not involve "monetizing the exemptions by selling or transferring them for other considerations to other parties, an obvious abuse at the center of the statute's prohibition." *Id.* at *4.

FAA reached a similar result in a 2008 decision involving the bankruptcy of ATA Airlines (ATA). *See Congestion Mgmt. Rule for LaGuardia Airport*, 73 Fed. Reg. 64,883, 64,884 (Oct. 31, 2008) (*ATA*). At the time of its bankruptcy filing, ATA held fourteen slots at LaGuardia Airport.[4] The

---

*See Pet. of the Air Carrier Ass'n of Am.*, Order No. 2006-3-6, 2006 WL 2658672, at *4 n.10 (DOT Mar. 7, 2006).

[4] As noted above, FAA distributes *slots*, *see* 14 C.F.R. §§ 93.121-93.133, 93.211-93.229, but DOT issues *slot exemptions*, *see* 49 U.S.C. § 41714(c). Although *ATA* involves slots, not slot exemptions, it is nonetheless analogous here. In practice, both slots and slot exemptions enable an aircraft to take off or land at a certain airport at a certain time. Moreover, the provision at issue in *ATA* is similar to section 41714(j). *Compare* 71 Fed. Reg. at 77,857 ("sales, purchases, or transfers of [slots] will not be permitted"), *with* 49 U.S.C. § 41714(j) (exemption may not be "bought, sold, leased, or otherwise transferred by the carrier to which it is

slots were subject to a FAA order which, much like section 41714(j), barred their "sale[], purchase[], or transfer[]." *See Operating Limitations at N.Y. LaGuardia Airport*, 71 Fed. Reg. at 77,857. When FAA was asked if a post-bankruptcy purchaser could retain the non-transferable slots, it answered in the affirmative. *See Congestion Mgmt. Rule for LaGuardia Airport*, 73 Fed. Reg. at 64,884. So long as the buyer acquired ATA's "business as a whole," it could continue to maintain the slots without violating FAA's no-transfer order. *Id.*

Rather than attempt to distinguish these cases, DOT has ignored them completely. Indeed, despite Republic's efforts, which twice directed DOT's attention to DOT and FAA precedent, neither DOT's November 25th Letter nor its Final Order even mentions the cases. The totality of DOT's reasoning is found in three sentences in its November 25th Letter:

> After careful review, we have concluded that a 'transfer' of exemptions has in fact occurred. Midwest, the party to which the awards were granted, has now ceased to exist as a carrier. Unlike Frontier, which was acquired by Republic but still operates as a subsidiary under its own operating certificate, Midwest clearly no longer holds or operates the exemptions, and Republic's claim to these exemptions arises only as a result of its transaction with Midwest.

November 25th Letter at 1-2. DOT's Final Order references these three sentences, calling them the "full discussion as to why [DOT] found that the proposed transfer would violate [section] 41714(j)." Final Order at 2 n.1.

---

granted"). In neither its November 25th Letter nor its Final Order did DOT explain why FAA precedent is not, at the very least, persuasive.

It escapes us how this so-called "full discussion" explains DOT's decision. In both *Reno Air* and *America West*, the "party to which the awards were granted" (like Midwest) eventually "ceased to exist as a carrier" (again, like Midwest). November 25th Letter at 1; *see Reno Air*, 1999 WL 95072, at *1; *America West*, 2006 WL 2658672, at *2-*5. In both cases, the acquiring carrier's (like Republic's) "claim to the exemptions ar[ose] only as a result of its transaction" with the carrier it acquired (like Midwest). November 25th Letter at 2; *see Reno Air*, 1999 WL 95072, at *1; *America West,* 2006 WL 2658672, at *4. Yet in both cases, DOT allowed the acquiring entities to retain the slot exemptions. *See Reno Air*, 1999 WL 95072, at *5; *America West*, 2006 WL 2658672, at *4. Similarly, when Southwest Airlines (Southwest) acquired ATA's business as a whole in the ATA bankruptcy proceeding, ATA "ceased to exist as a carrier" and no longer "h[eld] or operat[ed]" the slots. November 25th Letter at 1; *see* 73 Fed. Reg. at 64,884. Nevertheless, FAA allowed Southwest to retain and utilize the slots originally issued to ATA. 73 Fed. Reg. at 64,884.

Moreover, while it is true that—unlike Frontier Airlines which Republic acquired in July 2009—Midwest no longer intended to operate under its "own operating certificate," DOT's scant analysis fails to explain why this fact has any bearing on whether an impermissible slot transfer occurred. An air operator's certificate (AOC) is simply FAA's approval to operate an aircraft for commercial purposes. *See* 14 C.F.R. § 119.5(b). Because Midwest intended to change the aircraft servicing the KCI/Reagan National route (from Boeing 717s to EmbrBaer regional jets), it was required to obtain a new AOC. But rather than explain how a new AOC could be relevant to determining if a slot-exemption transfer occurs, DOT asks us in effect to guess at its underlying reasoning. But we cannot uphold its action based on speculation. *See Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d

319, 328-29 (D.C. Cir. 2006) ("Arbitrary and capricious review strictly prohibits us from upholding agency action based only on our best guess as to what reasoning truly motivated it.").

DOT asserts a new reason for distinguishing the Republic/Midwest merger in its brief on appeal. According to DOT's new position, what really matters is *when* the acquired airline ceases to exist: "[I]f an air carrier is acquired by another company, but continues post-acquisition to operate, DOT has determined that no [] transfer of control over the slot exemptions has occurred." Respondent's Br. at 12. But this argument fails for two reasons. First, it is *post hoc* rationalization that cannot support DOT's action. *See State Farm*, 463 U.S. at 50 ("[T]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action."); *Manin v. Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011) ("[T]he law does not allow us to affirm an agency decision on a ground other than that relied upon by the agency."). Second, Midwest did not cease to exist as an operating entity when it was acquired. Indeed, Republic Holdings completed the stock purchase nearly three months before seeking to merge Midwest's operations with Republic's. DOT's *post hoc* rationalization therefore would do nothing to advance its case.

For the foregoing reasons, we grant Republic's petition for review and vacate DOT Order No. 2010-12-16.

*So ordered.*